## IN EQUITY.

## GEORGE A. LATHROP *vs.* R. W. WOOD.

However inartificial or untechnical the manner in which an agreement is drawn up, equity will give effect to the real intentions of the parties, as gathered from the objects of the instrument and the circumstances of the case.

The court construed an instrument to be a contract of co-partnership, on the ground that its terms plainly contemplated a communion of interest and a mutuality of profits and losses.

### DECISION OF CHIEF JUSTICE LEE.

The complainant's bill in this case sets forth that the defendant and A. H. Spencer entered into an agreement on the 1st day of October, 1850, by which the defendant in consideration of the sum of $3962 50, to be paid by Spencer, agreed to convey to the said Spencer one half of certain lands and other property known as the East Maui plantation; that on the first day of November, 1850, Spencer in consideration of the sum of $4962 50, assigned to the complainant all his right, title, interest, claim and demand under the contract with Wood; and alleging that the said Wood has refused to make the conveyance,

though the money has been paid to him as agreed by Spencer, prays that the defendant may be compelled to make a conveyance to Lathrop, he being Spencer's assignee and real owner of all Spencer's interest in the plantation.

The defendant has filed a general demurrer to the bill, and assigns as cause, that the contract on which the bill is based is one of copartnership for a limited period not yet expired, between the defendant and Spencer, and can only be enforced as between the parties thereto; and, secondly, that the contract by its own terms is not assignable, and that Lathrop as assignee can take no interest therein to the prejudice of the defendant. The complainant's counsel reply that the agreement is not one of co-partnership, but a contract to convey certain lands and other property to Spencer on conditions, which have been fulfilled.

The agreement is in the following words:

" This' agreement made the first day of October, one thousand eight hundred and fifty, between Robert W. Wood, resident of Honolulu of the first part, and A. H. Spencer, now resident of Honolulu, of the second part, Witnesseth, That for certain considerations hereinafter mentioned, the party of the first part engages to convey to the party of the second part, on or before the first day of October, 1851, one-half of his interest in a certain leasehold estate situated on East Maui, the same premises being fully described and set forth in a lease executed by the Minister of Interior of the Hawaiian Islands, on the 31st day of January, 1848, to Wm. Crowningsburgh and fully recorded in the office and numbered 515 subject to the rent reserved in said lease; also one half of my rights and interests in a tract of land makai of the tract above described amounting to two hundred acres, under a contract for a lease of the same with M. Kekauonohi, both of the above tracts having been conveyed to me by said William Crowningsburgh, by deed of conveyance under date 22d April, 1850. Also one half of my interest in a certain other tract of land situated in East Maui under a verbal contract for a warranty deed with Richard Armstrong, in consideration of which contract the party of the first part has paid to the said Armstrong one thousand dollars. Also one half my interest in all the personal property, situated in East Maui, consisting of working oxen, cattle, carts and building materials, also six house frames in Honolulu, all the above property being more particularly described and set forth in the schedule annexed, subject however to a mortgage in favor of R. C. Wyllie, and to the annual rents now due and current expenses since the first day of April last, subject also to a 'balance of about two thousand dollars which may be found to be due R. Armstrong on account of land purchased by him. And in consideration of the above properties engaged to be conveyed, the party of the second part agrees to pay or cause to be paid to the party of the first part three thousand nine hundred and sixty-two dollars and fifty cents, as follows: Two thousand dollars in thirty days from the date of this instrument, being the amount of a note of hand drawn by the party of the second part in favor of the party of the first part, and bearing even date herewith; one thousand dollars on the first day of January next, being the amount of a note of this date and the balance, nine hundred and sixty-two dollars and fifty cents on the first of October,

1851, being the amount of a note of hand of this date. And the party of the second part further engages to take charge of the above mentioned estate and properties and superintend the construction of necessary sugar mills, buildings, and such other works as may be necessary in the prosecution of the business of growing and manufacturing sugar, and to superintend and manage in person faithfully and to the best of his abilities the above sugar estate for the full term of three years from the date of this, and it is further agreed between the parties that in consideration of the above named services, the said A. H. Spencer shall be allowed a suitable house for himself and family and the privilege of keeping without charge what horses and cows he may require for his family use, and allowed a salary of two thousand dollars a year, and the said A. H. Spencer engages that during the above mentioned time he will engage in no other business, trade or speculation, whether pertaining or not to the duties of superintendent on his private account, but shall devote his whole time to the joint interests of both parties, and it is further agreed between the parties that the liabilities upon the above property, viz, two thousand dollars due R. C Wyllie on his mortgage, also two thousand dollars or thereabouts, due R. Armstrong, also the rent and current expenses incurred since the first of April last, shall be borne equally by both parties. And it is further agreed that one half of all the advances made from this date for the erection of buildings, sugar mills, and all current expenses including salary of the superintendent, and all losses shall be borne equally by both parties, also all profits arising from the business to be divided equally.

" And the party of the first part engages to furnish so much capital as may be necessary to erect and put in operation a sugar mill, and make such other improvements as the interests of the place may require under a judicious and economical administration by the party of the second part, and such amounts as may become due said Wyllie and Armstrong, on account of a mortgage, and land purchased of said Armstrong. And the party of the second part agrees to apply all his interest in the nett proceeds of such amounts as may be due from him to the party of the first part on account of the plantation. And it is further agreed that an account current between the parties shall be made out on the first of October, 1851, and that any balance that may then be found to be due to the said party of the first part, shall be secured to him by a mortgage on the interest which said A. H. Spencer may have in the estate which is to be conveyed as above set forth.                                   R. W. WOOD,
                                        A. H. SPENCER."

The first question is, what is the nature of this agreement. Is it a contract of co-partnership between the parties, or is it, as the complainant contends, a mere executory contract for the conveyance of one-half of the East Maui plantation on the payment of the three notes ? In the construction of all agreements, the only proper rule is to seek for the intention of the parties. However inartificial or untechnical the manner in which the instrument is drawn up, equity will give effect to the real intentions of the parties, as gathered from the objects of the instrument and the circumstances of the case. I have read this instrument with much care, and, in my opinion, it was the evident intention of the parties to create a partnership, and I can-

J

not see how the instrument can bear any other fair interpretation. The parties to it were to become joint and equal owners of the capital stock of the business, the lands, oxen, cattle, carts, building materials and other personal property. Spencer was to take charge of the plantation and superintend the erection of the mills, buildings, and other works necessary for the prosecution of the business, and to " devote his whole time to the joint interests of both parties " In other words, Spencer was to be the *working* partner, and for his exclusive devotion to the joint interests of the concern, he was to have a suitable house for himself and family, certain rights of pasturage, and a salary of two thousand dollars. The liabilities upon the property, namely, the mortgage of Mr. Wyllie, the debt of Mr. Armstrong, the rents due, and the current expenses from the 1st day of April, 1850, were to be borne equally by both parties. " And it is further agreed that one-half of all the advances made from this date for the erection of buildings, sugar mills, and all current expenses, including salary of the superintendant, and all losses shall be borne equally by both parties, also all the profits arising from the business to be divided equally." A mutual participation of profits and losses in any business has always been considered as creating a partnership, and there is such a plain communion of interest and mutuality of losses and profits in this case, as to my mind creates a partnership beyond a doubt. If the construction contended for by the learned counsel for the complainant be true, namely, that Spencer is a mere agent of Wood for carrying on the plantation, receiving a stipulated sum for his services, and having none of the rights and powers of a partner over the plantation and its business, why, I would ask, is Spencer to own one-half of the capital stock? Why is he to devote his whole time to the joint interests of both parties? Why pay half the advances and expenses? Why pay half of his own salary as superintendent, or share equally in the losses or profits of the business? To my mind it is clear that from the signing of the agreement on the first day of October, 1850, Spencer became clothed with all the rights and liabilities of a partner in the East Maui plantation, and had as great a voice and control over its operations and business as the defendant Wood. To call Spencer a mere agent or servant of the East Maui plantation while he has a community of interest in all its property, and is to share equally in all its losses and profits, would be doing violence to every principle of the law of partnership. But it is said that the word partnership does not once occur in all the agreement. Very well, such word need not so occur to create a partnership, if the intention of the parties is plain as in this case.

But it is further said that if this be an agreement of partnership, it is not one in accordance with the statute of 1841, which requires public notice to be given of partnerships. The language of the statute is as follows: " When the agreement as to the partnership is completed, it must then be made public, that the people may hear it. The proper way is to print it, but if that be not done, then let the notice be written and the writing be made public, after which the whole number of persons included in the company become one in law."

The partnership was completed on the first day of October, 1850, but whether public notice was ever given of it or not does not appear, any further than the fact that it was duly recorded in the office of the

public registrar, which for certain purposes is notice to the world of its contents. There is nothing in the statute saying that partnerships not made public shall be illegal or void—there is no penalty of any kind annexed to the law; but perhaps the proper construction to be given to such a statute would be to infer that if the agreement was not made public it would not be binding or valid, but it will be time enough to decide that question when the complainant establishes the fact that it has not been made public. But granting the position taken by the complainant to be true, namely, that there is no partnership because no public notice of the agreement has been given, and what is the result? The agreement is clearly one of partnership, and if it is null for one purpose, it is null for every purpose, and the complainant's case inevitably falls to the ground. It is upon this agreement that he bases his suit, and if it be void, how can he ask a decree for its specific performance. No, the agreement is one of co-partnership, and, so far as appears by the bill, a legal and valid one.

I shall now proceed to the second question, namely, whether under the agreement Spencer could assign his interest in the partnership property to the complainant. It is argued by the defendant that Spencer had only a contingent interest in the property to be conveyed, not coupled with any present interest—a mere chose in action, not assignable. However sound this doctrine may be in law, it is not so in equity. "The Courts of Equity," says Judge Story, "will support assignments not only of choses in action, and of contingent interests and expectancies, but also of things which may have no actual or potential existence, but rest in mere possibility; not indeed as a present positive transfer operative *in presenti*, for that can only be of a thing in esse, but as a present contract, to take effect and attach as soon as a thing comes into esse." And again, "contingent interests and expectancies may not only be assigned in Equity; but they may also be the subject of a contract, such as a contract of sale when made for a valuable consideration which Courts of Equity, after the event has happened, will enforce. (Story's Eq. Jur. Vol. 2, § 1040, 1040 B., 1055.)

But it is worthy of remark in connection with this subject, that while courts of law consider contracts respecting lands or other things as simple executory agreements not attaching to the property in any manner, as an incident, or a present or future charge, courts of equity regard them in a very different light. They treat them for most purposes precisely as if they had been specifically executed. "Thus," says Judge Story, "if a man has entered into a valid contract for the purchase of land, he is treated in equity as the equitable owner of the land; and the vender is treated as the owner of the money. The purchaser may devise it as land even before the conveyance is made; and it passes by descent to his heir as land." (Story's Eq. Jur. vol. 2, § 790.) "It is a rule that what is contracted to be done for a valuable consideration is considered as done, and nearly all the consequences follow as if a conveyance had been made at the time to the vendee." (I Madd. Ch. Pr. 364.) There can be no doubt that the interest of Spencer was an assignable one, and that he had the power to convey all his interest under the contract to the complainant. But say the learned counsel for the defendant, Wood was to convey one-half of the property to *Spencer*, not to Spencer and *his assigns*, and

consequently by the very terms of the contract, he cannot be compelled to convey to Lathrop, though he be the *bona fide* purchaser and owner of Spencer's interest. At first I was inclined to give some weight to this point, but upon reflection I am of the opinion that the absence of the word assigns cannot materially affect the case. Spencer had the right, upon certain conditions to be performed, to call for a deed of conveyance—it was such a right as he could sell and assign—one that he did sell, and assign to Lathrop—and if Spencer could compel a conveyance, then Lathrop may, subject however to all the liabilities and equities which attach to Spencer. Where the word assigns is omitted in a deed of conveyance, or in a contract to convey, it seems reasonable to me that equity should supply it, unless there be something in the deed or contract showing an intention to limit the conveyance to the person named. Let us take a case by way of illustration, suppose Spencer, without conveying to Lathrop had become bankrupt, and made an assignment to his creditors of all his interest under the contract in part payment of his debts. Would it be contended that the assignees could not compel a conveyance to them because the word assigns was not in the agreement? Let us suppose again, that Spencer had died before receiving any conveyance from Wood; would it be said that his heirs or representatives could not compel it because they were not named in the deed? I apprehend not. Where A, for instance, conveys or agrees to convey an estate to B, equity in the absence of any restraining clause, will construe it to mean to B, his heirs and assigns. Justice and reason would seem necessarily to imply that such was the intention of the parties, and equity would carry it out. The ruling of Lord Eldon in the case of Church *vs.* Brown, (15 Vesey, 264,) has an important bearing on this point. It is said by Judge Story, "that, in general, where the specific execution of a contract respecting lands will be decreed between the parties, it will be decreed between all persons, claiming under them in privity of estate, or of representation, or of title, unless other controlling equities are interposed " And at the close of the same section he adds, "if the vendee under such a contract conveys the same to a third person, the latter, upon paying the purchase money, may compel the vendor, and any person claiming under him in privity, or as a purchaser with notice, to complete the contract and convey the title to him."

I am clearly of the opinion that the agreement of October 1st, 1850, is one of co-partnership between Spencer and Wood, that the assignment is a valid one, that Wood holds half of the East Maui plantation as the trustee of Lathrop, and is bound to give him a conveyance of it. But he who asks equity must do equity, and the question now arises upon what terms he can have a conveyance. To determine this question we must go back to the partnership agreement, ascertain its limit, and see how it is affected by the assignment. There is no express time fixed for the determination of the partnership, but from the reading of the instrument it was the evident intention of the parties that it should last for three years, the time for which Spencer contracted to superintend the plantation. We are here met by the question, Does the partnership still exist, or was it brought to a close by the assignment? It is a well established rule of law that an assignment by one partner of all his interest in the part-

nership property operates as a dissolution *ipso facto*, even though the partnership agreement provides for the continuance of the partnership for a definite period. In the case of Marquad *vs.* the New York Manufacturing Company, (17 Johnson's Rep. 525,) where one partner assigned all his interest in the partnership stock to a stranger, it was held that such an assignment, *bona fide* made, *ipso facto* dissolved the partnership, although it appeared that by the articles the partnership was to continue until two of the contracting parties should demand a dissolution; and the other parties wished the partnership to go on notwithstanding the assignment. In this case the assignment was made as collateral security for the payment of debts due from the partner so assigning. (Collyer on Partnership, Sect. 110.)

This is also the opinion of Justice Story and Chancellor Kent. "A voluntary and *bona fide* assignment," says the latter, "by a partner of all his interest in the partnership stock, has the same effect, (as the bankruptcy or insolvency of a partner) and dissolves the partnership. This is upon the principle that a partnership cannot be compelled by the act of one partner to receive a stranger into the association, which *is* founded on personal confidence." (3d Kent's Com. 4th ed. 59.) Justice Story says: "Such an assignment *per se* operates at once as a dissolution, upon due notice thereof by the party making or receiving the assignment. The only point open for discussion seems to be whether the same conclusion ought to be admitted when the the partnership is for a fixed or definite period, and the assignment is made within that period in contravention of the partnership articles. And it has been held that *if* the assignment is made *bona fide*, it operates *ipso facto*, as a dissolution of the partnership, since the purchaser is not compellable to become a partner, nor, on the other hand, are the other partners compellable to admit him as such." (Story on Partnership, § 308.) Apply this clear rule of law to the case in hand, and what is the result ? It is, that from the time when the defendant received notice from Spencer or Lathrop of the assignment, the partnership was dissolved. When this notice was given, if at all, we are not informed. It is admitted, if I understand the parties, that the business has been carried on by Wood and Spencer up to the present moment under the terms of the agreement, and probably under the belief that the partnership was in full force and existence, but if not at an end before, it must be from the commencement of this suit, for certainly it cannot be contended that the defendant is bound to take a stranger into the firm' without his consent, neither can the plaintiff be forced to such a course against his will.

But it is said that Spencer has not assigned *all* of his rights as a co-partner; but I think a careful reading of the assignment will show that he has, reserving nothing to himself but his privileges and salary as superintendent, which reservation cannot prevent the dissolution. But it may be further urged that no dissolution is prayed for in the bill. To this, the answer is, that no such prayer is necessary, neither would it be proper; for it has already taken place by the operation of the assignment, and cannot be avoided even by the consent of the parties, for such would not be the revival of the old partnership, but the formation of a new one.

The position of the parties then is this, Lathrop occupies the place of Spencer, being entitled to all his rights and subject to all his lia-

bilities under the contract—while Wood is bound to give the conveyance, and at the same time entitled to call upon the complainant to execute the mortgage and to perform the other duties and covenants imposed upon Spencer. I see no other course left but to refer the matter to a Master to ascertain the balance due Wood on the first day of October, 1851, for which he is to receive a mortgage on the assigned interest of Spencer, and also to take an account of the receipts and expenditures of the plantation from the first day of October, 1851, up to the time of the dissolution, as it may be agreed upon by the parties or ascertained by the Master, in order that the losses, if any, may be shared by the complainant, or in event of the Master's examination showing a profit, that the same may be applied in part payment of the mortgage. The taking of an account of the transactions of a partnership is consequent upon dissolution, for until it is taken, the business of the concern cannot be fully or equitably wound up.

Honolulu, June 28, 1852.